UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| DANIEL D. GARCIA, | ) |
| Petitioner, | ) ) ) |
| VS. | ) ) Civil Action No: SA-10-CA-1059-XR |
| RICK THALER, | ) ) ) |
| Respondent. | ) ) |

**ORDER ACCEPTING UNITED STATES
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

On this date, the Court considered (1) the Magistrate Judge's Memorandum and Recommendation concerning Petitioner Daniel Garcia's petition for a writ of habeas corpus under 28 U.S.C. § 2254 (Docket No. 17); (2) Garcia's objections to that report (Docket No. 22); and (3) Respondent Rick Thaler's objection to that report (Docket No. 21). After careful consideration, and de novo review, the Court ACCEPTS the Magistrate Judge's recommendation and DENIES Garcia's petition for a writ of habeas corpus.

**Background and Procedural History**

Garcia is currently serving a ninety-nine-year sentence in the custody of state authorities based on his 2002 conviction for the murder of his ex-wife, Lesa Garcia. *Garcia v. Texas*, 201 S.W.3d 695, 697 (Tex. Crim. App. 2006). The following facts are taken from *Garcia v. Texas*, 150 S.W.3d 598 (Tex. App.—San Antonio 2004):

> [I]n January 1995, Lesa and Danny [Garcia] married. . . .
> . . .
> On Sunday, May 24, 1998, Lesa, Danny, and their two small children went to the family compound for dinner at Danny's parent's [sic] home. That evening, on

the way home from the family dinner, Danny and Lesa argued . . . . Danny stopped the car on Loop 1604 and forced Lesa out of the car. He then drove away. Lesa walked about two miles to a grocery store and called her sister, Laura Jacobs, to pick her up. Lesa then spent the night at her sister's home. Five days later, Lesa reported the incident to Officer Marquin of the San Antonio Police Department. Because of the incident, Lesa and Danny separated for two and a half months, reconciling in August 1998. . . .

  On July 29, 1999, Lesa and Danny went to an appointment with [marriage counselor] Dr. Theis. During this session, the "car dumping" incident of May 1998 was discussed. According to Dr. Theis, the "car dumping" incident was a recurring theme of discussion during the counseling sessions. During the July 29th session, the topic of divorce was broached, at which time Danny shook his finger at Lesa and said that divorce was not an option. Dr. Theis understood Danny's statement to be a reminder to Lesa of her devout Catholic beliefs. Also during the session, Danny admitted that he could become physical with Lesa if she pushed him. According to Dr. Theis, Danny stated that "everyone has their breaking point and that if Lesa nagged and nagged him, he could become physical with her." Dr. Theis assumed Danny's statement meant the end of the marriage. The following morning, Dr. Theis called Lesa and recommended that she file for divorce. He also recommended that she obtain counsel and a protective order.

  On August 6, 1999, Lesa hired Sara Hermann as her attorney. Plans were made to serve Danny on the evening of August 9, 1999, Lesa's birthday. At approximately 6:45 p.m. on August 9th, Mitchell Cromwell served Danny with divorce papers. Cromwell informed Danny that the divorce papers included a court order ordering Danny to vacate the home by 9:00 p.m. that same evening. According to Cromwell, Danny responded by stating, "That bitch will pay." . . . According to Danny's family, he was not angry with Lesa that evening, but was sad that they were divorcing.

  The next day, Lesa hired a locksmith to re-key her home. She also began communicating with Danny through emails. From August 1999 to February 2000, they communicated primarily via email. According to Danny, he wanted to communicate via email because he did not trust Lesa and wanted a record of their discussions. On August 21, 1999, Lesa had the alarm system in her home repaired and entered a new code to arm and disarm the system.

  Lesa and Danny worked together regarding visitation of their children. . . . According to Danny, he would pick up his two children on Wednesday afternoons at day care and return them Thursday mornings. And on his weekends, he would pick them up on Friday evenings at day care and return them to day care on Monday mornings. The State, however, presented evidence that Danny would not return the children to day care on Monday mornings, but would instead return them to Lesa at the Falcon Oak residence on Sunday night.

  In an attempt to avoid hefty legal fees, Lesa and Danny were also working on a divorce settlement. On November 5, 1999, Danny's attorney, Bob Estrada, sent

2

Lesa's attorney, Sara Hermann, a proposed divorce decree and property settlement reflecting the terms and conditions agreed to by Lesa and Danny.  By early January 2000, Hermann had not responded to the proposed decree.  Estrada sent discovery to Hermann and set trial for February 17, 2000.  Hermann responded by seeking discovery of Danny's retirement/brokerage account.  On February 17, 2000, Lesa, Danny, Sara Hermann, and Bob Estrada met in a jury room at the Bexar County Courthouse, attempting to settle the divorce and property division.  Hermann demanded $7500 of the approximately $100,000 that was in Danny's brokerage account.  According to Hermann, there had been some commingling of community funds.  Danny and Estrada refused the demand. . . . Hermann praised both Lesa and Danny for setting their differences aside and working things out amicably. . . . Hermann and Lesa then exited the room, at which time Lesa told Hermann that Danny was getting upset and that she was afraid of him again. . . .

. . .

. . .

On Sunday, February 20, 2000, . . . . [s]everal members of the Garcia family were present for the family dinner[, including Danny and his sons; Sam Sigoloff; Brian Sigoloff; and Sam and Brian's friend Ben Hicks.  Sam, Brian, and Ben had plans to camp outside on the compound that evening.  After dinner,] Danny and his two boys also left for the mobile home [that Danny was keeping on his parents' property].  According to Danny, when he left his parents' home, he was carrying Ian, his youngest son, in his left arm, holding the children's diaper bag in his right hand, and walking with Daniel.  As Danny approached the corner of the mobile home closest to his parents' home, he put Ian down on the ground.  His knee gave way and he tripped on something and fell backward and to his right, hitting the ground with the back, right side of his right hand.  Danny believes that he either tripped on the trenches that had been dug for the sewer, electrical, and water connections for the mobile home or on rough hill country terrain.  Danny testified that as a result of the fall, he bruised his right hand.

After he entered the mobile home, Danny took off his long-sleeved sweatshirt and bathed his children.  According to Danny, when he was picking Daniel up out of the bathtub, he lost control of Daniel who started to slide.  Daniel then grabbed for Danny's neck and scratched Danny's chest.

. . .

Around 9:00 p.m., Lesa's next door neighbor, Lamerie Sheffield, saw Lesa in her back yard watering her lawn.

. . .

. . . The Garcia family home has a "dinger," a hose that runs across the drive at the front gate. When a car runs over the "dinger," a loud bell sounds in the Garcia home. The purpose of the "dinger" is to indicate when someone enters the family compound.  Neither Sally nor Dr. Daniel Garcia heard the dinger ring after 1:00 a.m.

Sometime in the middle of the night, Ben Hicks saw some car headlights enter the property and go over to Danny's mobile home.  Ben Hicks testified that he

3

heard a car door open and close. Ben asked Sam, "Who is it?" According to Ben, Sam replied, "Oh, it's just my uncle." Ben believed that he saw the headlights around 3:00 a.m. However, Ben was not wearing a watch; he was estimating the time based on his own belief. Neither Sam Sigoloff nor Brian Sigoloff saw these headlights heading to Danny's mobile home. They did not hear Danny's pick-up truck that night, nor did they hear car doors opening and closing. Moreover, Sam and Brian testified that all three boys had been drinking beer that night at the campsite. Although Ben Hicks admitted that he had drunk beer before at the campsite, he denied drinking beer on that occasion.

  At around 7:30 a.m. on Monday, February 21, 2000, Danny dropped off his two sons at daycare. . . .

  That same morning, Patricia Bach, one of Lesa's friends and co-workers, called Lesa at work. Lesa was not there. Bach called the daycare and was told that Lesa's boys were present. Bach then drove over to Lesa's house to check on her. When Patricia arrived, she noticed that Lesa's red Suburban was "backed in" the driveway. The exterior lights to the house and the soaker hoses were still on. She rang the doorbell, but no one responded. Patricia walked around to the back of Lesa's house, and looked into a window. She saw Lesa's purse sitting on the kitchen counter, but did not see Lesa. Patricia then walked back to the front of the house and felt the hood of the Suburban. The hood was cool to the touch. Patricia then drove home and called Lesa's employer, suggesting that the employer contact Lesa's stepfather, Ken Cadena.

  Someone at Lesa's place of work contacted Ken Cadena. Ken obtained the keys to Lesa's house and accompanied by his secretary, drove to Lesa's house. Like Patricia, Ken noticed that the Suburban had been backed in. Ken thought this was unusual as Lesa did not usually park her car in that manner. Ken placed a key in the top bolt lock, but could not remember if the door was locked or not. He then inserted the same key into the button lock on the door knob and opened the front door. When the door opened, the alarm began sounding. Ken could not disable the alarm. He then saw Lesa's body, only covered by a shirt, lying just inside the front door at the foot of the stairs. Surrounding her body were sheets and a pillow.

  The first police officer on the scene, Officer Hernandez, quickly ascertained that there had been no forced entry. Many other officers, detectives, and technicians arrived. Lesa's partially nude body was videotaped and photographed. Her hands were bagged for DNA analysis. Lesa's head was soaked with blood. Upstairs, there were blood splatters on the wall behind the bed in the master bedroom. Spots of blood in the carpet led from the master bedroom down the stairs to Lesa's body.

  . . .

  . . . At approximately 3:30 p.m., Detectives Gonzalez and Roberts arrived at Danny's work. Danny met the detectives and showed them to a conference room. According to the detectives, Danny was relaxed and nonchalant. Because Danny's shirt was not buttoned all the way to the top, Detective Roberts noticed two scratches below his adam's apple on his neck. Danny was cooperative, but seemed

  unconcerned with the situation.  He was not nervous.  According to Detective Roberts, in an attempt to get an emotional response from Danny, he said, "Your fucking wife is dead."  Danny did not respond emotionally.  Danny agreed to accompany the detectives downtown for questioning.  He locked his office.  When he came back downstairs to meet the detectives, the top button on his shirt was buttoned.

  Danny accompanied the detectives downtown for questioning.  He denied killing Lesa. . . .

  When asked about the scratches on his neck, Danny said that he was playing with his kids and one of them scratched him.  The detective then obtained a search warrant to photograph Danny and get blood, hair, and DNA samples.  Around 8:30 p.m., Detectives Roberts and Gonzalez took Danny to a hospital.  After arriving at the hospital, the detectives, for the first time, noticed bruising on Danny's right hand.  According to Detective Roberts, during questioning, Danny had his hands in his lap.  And, Danny was not the type of person to speak using his hands.  Photographs of the scratches on Danny's neck and his bruised right hand were taken.  [Danny is left-handed.]

  On February 22, 2000, an autopsy was performed on Lesa.  According to Dr. Jan Garavaglia, a combination of strangulation and blunt head trauma caused Lesa's death.

*Id.* at 600–605.  After being tried and convicted for Lesa's murder, Garcia unsuccessfully pursued direct appeals of his conviction.  Mem. in Support of Habeas Corpus at 2–3 (Docket No. 2).  Garcia filed the instant petition for a writ of habeas corpus on December 30, 2010.  (Docket No. 1).  In his petition, he raises five grounds for relief: (1) that he was denied a public trial; (2) that he was denied due process during his trial because of erroneously admitted evidence; (3) that the state withheld exculpatory evidence; (4) that his trial counsel failed to provide effective assistance; and (5) that the evidence was insufficient to support his conviction.  Mem. in Support of Habeas Corpus (Docket No. 2).

**Magistrate Judge's Memorandum and Recommendation**

  The Magistrate Judge recommended that Garcia's petition for writ of habeas corpus be denied.  Magistrate Judge's Memorandum and Recommendation ("M&R") 1.

First, the Magistrate Judge addressed Garcia's argument that he had been denied the right to a public trial when his friends and family were removed from the courtroom during voir dire. *Id.* at 10.  Garcia's attorney failed to object to the removal of the public from the courtroom. *Id.* at 11. The Magistrate Judge noted that if the last state court rendering judgment in a case clearly and expressly states that its judgment rests on procedural default, then habeas review of a federal claim is barred. *Id.*  The Magistrate Judge explained that the last state court to review Garcia's case had held that his public trial claim was procedurally defaulted for failure to object, *id.* at 12, and concluded that habeas review was thus barred, *id.* at 15.  The Magistrate Judge rejected Garcia's argument that the denial of a public trial is a structural defect that can be reviewed without having been objected to, *id.* at 12, noting that the Supreme Court has held that the right to a public trial can be waived by failure to object to exclusion of the public from the courtroom, *id.* at 14.  The Magistrate Judge also noted that Garcia had not made the showing required to overcome the procedural bar. *Id.* at 15–16.

Second, the Magistrate Judge discussed Garcia's various objections to the admission and exclusion of evidence during his trial. *Id.* at 16.  The Magistrate Judge noted that a federal habeas court will only review whether the admission of evidence was so unduly prejudicial that it rendered the trial fundamentally unfair in violation of the Due Process Clause. *Id.* at 19–20.  Garcia objected to the admission of evidence (1) that Lesa's employer had collected a photograph of Garcia as part of a security plan, *id.* at 16; (2) that in 1998 Garcia had forced Lesa out of their car on the side of the road at night and left her there, *id.* at 25; and (3) that Garcia was an atheist, *id.* at 27.  As to each of these, the Magistrate Judge recommended that, even if the evidence was admitted in violation of Texas rules of evidence, it did not rise to the level of rendering the trial fundamentally unfair such

that due process was violated. *Id.* at 20, 27, 28. As to Garcia's objection that evidence of emails he and Lesa had exchanged should have been admitted during the trial, the Magistrate Judge determined that exclusion of the emails did not prevent Garcia from presenting his defense, and that therefore due process was not denied. *Id.* at 24.

Third, the Magistrate Judge determined, in response to Garcia's objection that the state withheld exculpatory evidence, that Garcia had failed to meet any of the *Brady v. Maryland*, 373 U.S. 83 (1963), requirements for showing that exculpatory evidence had been withheld. *Id.* at 34.

Fourth, the Magistrate Judge addressed Garcia's argument that his trial counsel had been ineffective. As to Garcia's argument that his trial counsel was ineffective for failing to object to the exclusion of the public from the courtroom during his trial, the Magistrate Judge determined that at the time of Garcia's trial, it had not yet been established that the Sixth Amendment is violated by exclusion of the public from voir dire of prospective jurors. *Id.* at 37. For this reason, Garcia's counsel had not been ineffective for failing to object. *Id.* With regard to Garcia's argument that his counsel had failed to conduct adequate pretrial investigation, the Magistrate Judge concluded that Garcia had failed to argue what evidence a more thorough investigation would have uncovered and how that additional evidence would have changed the outcome at trial. *Id.* at 40. The Magistrate Judge also noted that the state habeas court had found that Garcia's counsel had conducted a sufficient investigation and that this factual finding was entitled to deference. *Id.* at 41. The Magistrate Judge concluded that counsel had not been deficient in this regard and that no prejudice had been shown. *Id.* at 53. Finally, in response to Garcia's argument that his counsel was deficient for opening the door to evidence that Garcia is an atheist, the Magistrate Judge found that Garcia's counsel was unaware of potential evidence of Garcia's atheism and that therefore his questioning

was not defective. *Id.* at 56.

Fifth and finally, the Magistrate Judge determined that the evidence had been sufficient to support Garcia's conviction. *Id.* at 60. The Magistrate Judge thus recommended that Garcia's petition for habeas relief be denied. *Id.* at 61.

**Standard of Review**

The Court must review de novo any of the Magistrate Judge's conclusions to which a party has specifically objected. 28 U.S.C. § 636(b)(1). The Court will examine the entire record with regard to that portion, and will make an independent assessment of the law. The Court reviews the rest of the report for clear error only. *Id.*

**Discussion**

**1. Denial of Public Trial**

Garcia argues that the Magistrate Judge erred in concluding that his claim about being denied a public trial had been procedurally defaulted for failure to object. Garcia argues that an objection was not required. Pet'r's Objections 5. Garcia is incorrect. Both the Supreme Court and the Fifth Circuit have held that the failure to object to a closure of the courtroom waives the right to a public trial. *See Peretz v. United States*, 501 U.S. 923, 936 (1991) (citing *Levine v. United States,* 362 U.S. 610, 619 (1960), for the proposition that "failure to object to closing of courtroom is waiver of right to public trial"); *United States v. Hitt*, 473 F.3d 146, 155 (5th Cir. 2006) ("Where a defendant, with knowledge of the closure of the courtroom, fails to object, that defendant waives his right to a public trial.").[1] Because there was no objection to the closure of the courtroom, Garcia waived his right to

---

[1] The petitioner in *Hitt*, like Garcia here, argued that the four-part test in *Waller v. Georgia*, 467 U.S. 39, 48 (1984), has to be applied before a courtroom can be closed. 473 F.3d at 155. The *Hitt* court noted that *Waller* was distinguishable because there the defendant had

a public trial.

In evaluating Garcia's state habeas petition, the state trial court noted that there was no objection from Garcia's counsel to exclusion of the public from the courtroom. Habeas Record, Vol.2 at 554. The findings of the state trial court were adopted by the Texas Court of Criminal Appeals when it denied Garcia's petition without a written order. *See* Mem. in Support of Habeas Corpus at 4 (Docket No. 2). Where a state judgment rests on independent and adequate state law grounds, federal review of an issue of federal law is prohibited. *Harris v. Reed*, 489 U.S. 255, 260 (1989). Where the state law ground is procedural default, a possible exception applies: if the petitioner can demonstrate cause for the default and actual prejudice, or show that failure to consider the federal claims would result in a fundamental miscarriage of justice, a federal court may review the federal claims. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Garcia argues that this standard does not apply when the federal claim is violation of the right to a public trial. Pet'r's Objections 5. Garcia argues that violating the right to a public trial is a structural defect for which prejudice need not be shown. *Id.* at 5–6. Garcia is incorrect. The case law that he cites merely stands for the proposition that violations of the right to a public trial are not subject to harmless error review *when the error is properly preserved*. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148–49 (2006); *Waller*, 467 U.S. at 42, 49–50. *Owens v. United States*, 483 F.3d 48 (1st Cir. 2007), a case that Garcia cites for the proposition that "no showing of harm is required," Pet'r's Objections 6, states explicitly, two sentences after the passage quoted by Garcia, that a procedurally defaulted public trial claim can only be heard if the petitioner

---

objected to closure of the court. *Id.* n.8. The court stated that "regardless of whether the *Waller* prerequisites are met, defendants can waive their right to a public trial" by failing to object. *Id.*

demonstrates cause for the default and actual prejudice, *id.* at 63. Garcia has failed to demonstrate either cause or prejudice, and thus his claim cannot be heard.

**2. Evidentiary Rulings**

Garcia next objects to the Magistrate Judge's recommendation that various evidentiary rulings of the trial court did not deny Garcia due process. Garcia's first argument relates to evidence admitted during his trial that Lesa's employer had collected a photo of Garcia and sent Lesa home as part of a workplace security plan. M&R 16. Garcia argues that admission of this evidence violated several rules of evidence, Pet'r's Objections 8; nevertheless, as the Magistrate Judge stated, M&R 17, it is not the role of a federal habeas court to review the admissibility of evidence under state procedural rules. *See Goodrum v. Quarterman*, 547 F.3d 249, 261 (5th Cir. 2008). A federal habeas court will only inquire into whether the admission of evidence was "so unduly prejudicial that it render[ed] the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). This requires the petitioner to show that the erroneously admitted evidence "was a crucial, highly significant factor in the defendant's conviction" and had a "substantial and injurious effect or influence in determining the jury's verdict." *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007) (internal quotation marks omitted).

The Magistrate Judge concluded that the security plan evidence was relevant to show that Lesa was afraid of Garcia, and determined that this evidence was not crucial because evidence of Lesa's fear was presented from many sources. M&R 18–19. In his objections, Garcia again fails to show how the security plan evidence was a crucial factor in his conviction, offering no more than conclusory assertions of prejudice. Garcia has not shown that admission of this evidence rendered his trial fundamentally unfair, and thus due process was not violated.

Next, Garcia challenges the Magistrate Judge's conclusion regarding emails exchanged between Garcia and Lesa that the trial court excluded. Garcia argues that, contrary to the Magistrate Judge's determination, exclusion of the emails was arbitrary. Pet'r's Objections 10. However, Garcia fails to show how the exclusion was arbitrary. According to Garcia's submission, the emails were excluded by the court based on rules of evidence prohibiting hearsay and requiring documents to be authenticated. *Id.* at 11. Regardless of whether the evidentiary rulings of the trial court were correct, neither these rules nor the court's application of these rules can be said to be arbitrary. Garcia makes various arguments that the trial court's rulings were in contravention of the rules of evidence, Pet'r's Objections 11–12, but again, this is not a basis for providing habeas relief. *Goodrum*, 547 F.3d at 261. "A state court's evidentiary rulings present cognizable habeas claims only if they run afoul of a specific constitutional right or render the petitioner's trial fundamentally unfair." *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999).

Garcia argues that the emails were necessary to his defense because they: (1) contradicted testimony that Lesa feared Garcia; (2) contradicted testimony that Garcia always dropped off the children with Lesa on Sunday nights rather than at daycare on Monday mornings; (3) contradicted evidence that Lesa and Garcia were going through a nasty divorce; and (4) showed the nature of the relationship between Lesa and Garcia and their respective states of mind prior to her death. Pet'r's Objections 11–13. As the Magistrate Judge noted, M&R 23–24, Garcia was able to accomplish each of these purposes through his own testimony. He testified (1) that Lesa never said anything to indicate that she was afraid of him; (2) that he dropped off the children according to the schedule reflected on his calendar, which was admitted into evidence; (3) that Lesa and Garcia had been communicating cordially and working out their divorce. *Id.* He was also able to explain his

relationship with Lesa in the months leading up to her death. *Id.* at 24. Sara Hermann, Lesa's divorce attorney, also testified that she had complimented Lesa and Garcia for working through their divorce amicably. *Id.* In sum, Garcia was still able to present his defense to the jury. His trial was not rendered fundamentally unfair by the exclusion of the emails because he had other means of proving the facts that the emails would have tended to prove.

Garcia next argues that the Magistrate Judge was incorrect in concluding that evidence of the "car dumping" incident was rationally connected to the charged offense. Pet'r's Objections 14. Garcia's argument that the evidence was admitted in violation of the rules of evidence, *id.* at 16–17, is not cognizable. *Goodrum*, 547 F.3d at 261. The only issue is whether the admitted evidence rendered the trial fundamentally unfair. *Johnson*, 176 F.3d at 820.

As the Magistrate Judge concluded, the evidence was rationally connected to Lesa's murder. M&R 26. The car dumping incident was a significant moment in Lesa and Garcia's marriage. It precipitated a separation and marriage counseling, during which it was a recurring topic of discussion. *Id.* The evidence was probative of the nature of Lesa and Garcia's marriage, the problems in their marriage, and the way Garcia treated Lesa, and hence rationally connected to the charge that Garcia murdered Lesa. In addition, Garcia was able to explain his version of this incident when he took the stand. In sum, the evidence did not render the trial fundamentally unfair.

Finally, Garcia objects to the Magistrate Judge's conclusion regarding evidence that Garcia was an atheist. Pet'r's Objections 18. The Magistrate Judge noted that Garcia was able to disavow this testimony when he took the stand and explain his belief in God and the Ten Commandments. M&R 28. Also, the Magistrate Judge stated that "[i]n the trial, which lasted two weeks, evidence of petitioner's religious beliefs played an extremely minor role." *Id.* The Magistrate Judge thus

concluded that this evidence was not so unduly prejudicial that it denied Garcia a fair trial. *Id.* Garcia argues that the evidence was unduly prejudicial because it damaged Garcia's credibility. Pet'r's Objections 19. Even if it is assumed that the evidence undermined Garcia's credibility, Garcia has not shown that the evidence was so unduly prejudicial that it denied him a fair trial. Garcia has failed to explain how this evidence rendered his trial unfair, especially given its minimal importance in the overall trial and Garcia's ability to contradict the evidence, as noted by the Magistrate Judge.

**3. Exculpatory Evidence**

Garcia objects to the Magistrate Judge's conclusion that the state did not withhold exculpatory evidence. Pet'r's Objections 23. Garcia contends that Garon Foster, an employee of the Bexar County Crime Lab who testified about DNA under Lesa's fingernails during the trial, was uncooperative with Garcia's theory of secondary DNA transfer, but that at another trial years later, *Eby v. State*, 165 S.W.3d 723 (Tex. App.—San Antonio 2005, pet. ref'd), Foster testified that he had documented many cases of secondary DNA transfer during his career. *Id.* at 23–25. Garcia argues that he should have been told that Foster had seen many cases of secondary DNA transfer in his career and that he should have been told that it is impossible to tell whether collected DNA was transferred directly or secondarily. *Id.* at 25.

In order for a criminal defendant to prove that the withholding of exculpatory evidence violated his due process rights, a defendant must prove (1) that the evidence was favorable to the defendant, (2) that the evidence was suppressed by the state, and (3) that the defendant was prejudiced. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Brady v. Maryland*, 373 U.S. 83 (1963).

As the Magistrate Judge concluded, the testimony Foster offered during Garcia's trial did not differ materially from the testimony that he offered in the *Eby* trial. M&R 33. During Garcia's trial, Foster testified that DNA can be deposited by drinking from a glass, brushing one's teeth, or using exercise equipment. Reporter's Record, Vol. 10, at 109–110. Foster also testified that DNA could be deposited on carpet, which was Garcia's theory of the case. *Id.* at 110. Foster also testified that the longer someone lives in a particular residence, the greater the quantity of their DNA can be assumed to have been deposited in the residence, which also aligned with Garcia's case theory. *Id.* at 109–110. This testimony does not materially differ from the testimony regarding secondary DNA transfer that Foster offered during the *Eby* trial. *See Eby*, 165 S.W.3d at 730. Foster's testimony was also consistent in that he stated in each trial that DNA can be found in living skin cells, but that he would not expect it to be found in dead skin cells. *See id.* and Mem. in Support of Habeas Corpus, Ex. O at 42. As the Magistrate Judge noted, the additional information that Garcia complains of not receiving could have been easily elicited during cross-examination. M&R 34. Garcia could have asked how many instances of secondary DNA transfer Foster had encountered in his career. He also could have asked whether it is possible to tell whether a DNA sample had been deposited directly or by secondary transfer. In light of these observations, the Magistrate Judge correctly concluded that Garcia failed to satisfy any of the *Brady* elements.

**4. Ineffective Assistance of Counsel**

Garcia next objects to the Magistrate Judge's recommendation regarding his claim for ineffective assistance of counsel. To obtain habeas relief on a claim of ineffective assistance of counsel, the petitioner must demonstrate that his counsel was deficient, which requires proving that his counsel's representation fell below an objective standard of reasonableness, and that the

deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). To show prejudice, the petitioner must show that there is a reasonable probability that, but for his counsel's deficiency, the result would have been different. *Id.* at 794. A reasonable probability is a probability sufficient to undermine confidence in the result. *Id.*

The first basis for Garcia's ineffective assistance claim is his trial counsel's failure to object to the closure of the courtroom. Pet'r's Objections 26. The Magistrate Judge concluded that Garcia's counsel had not been ineffective for failing to object, because the trial predated *Presley v. Georgia*, 130 S. Ct. 721 (2010), where the Supreme Court established that a defendant's right to a public trial is violated when the public is excluded from voir dire of prospective jurors. M&R 37. Because this right had not yet been established, the Magistrate Judge reasoned that Garcia's counsel was not deficient in failing to object. *Id.*

Garcia argues that the right had already been established by *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501 (1984). He is incorrect. *Press-Enterprise* establishes that the public has a right under the First Amendment to view the voir dire of prospective jurors. *See Presley v. Georgia*, 130 S. Ct. at 723. This is distinct from the issue of whether a defendant has a Sixth Amendment right to have the public present during voir dire, which issue was answered in 2010 by *Presley*. Because counsel's performance is judged by the law that existed at the time of trial, *Paredes v. Quarterman*, 574 F.3d 281, 287 (5th Cir. 2009), Garcia's counsel was not defective for failing to object. In any event, Garcia has failed to meet the second *Strickland* requirement of showing prejudice. Again Garcia takes out of context quotations from cases holding that harmless error review is not applied when the right to a public trial is violated. Pet'r's Objections 28–30. These cases do not support the conclusion that Garcia need not show prejudice when raising a Sixth

15

Amendment complaint in a habeas claim for ineffective assistance of counsel. Under *Strickland*, Garcia still must show prejudice, and he has failed to do so.

The second basis for Garcia's ineffective assistance claim is his counsel's alleged failure to conduct an adequate investigation of his case. *Id.* at 30. Counsel has a duty to make a reasonable investigation of a defendant's case or make a reasonable decision that a particular investigation is unnecessary. *Strickland*, 466 U.S. at 691. In order to succeed on a claim for inadequate investigation, a petition must allege with specificity (1) what the investigation would have revealed and (2) how it would have changed the outcome of the trial. *Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005).

Garcia's objections focus primarily on his argument that his trial counsel hired a bad expert witness, Dr. Robert Benjamin, whose testimony about the DNA evidence in the case was not sufficiently helpful. Garcia argues (1) that Benjamin overlooked an error made by the crime lab in its DNA analysis, (2) that the theory of secondary transfer about which Benjamin testified was unconvincing, and (3) that Benjamin had no forensic experience comparable to the that of the expert witnesses called by the State. Pet'r's Objections 31. Garcia argues that Dr. Paul Goldstein, an expert retained by habeas counsel, would have testified about the error in the DNA analysis and focused on this error to attack the reliability of the DNA report. *Id.* at 35.

As to Garcia's arguments about Benjamin's qualifications, the Magistrate Judge correctly concluded that Garcia has provided no basis for believing that counsel acted unreasonably in deciding to retain Benjamin, a qualified academic DNA expert, instead of someone with forensic DNA analysis qualifications. M&R 47. Garcia's argument about the weakness of the secondary transfer theory employs "the distorting effects of hindsight," *Strickland*, 466 U.S. at 689, relying on

post-trial discussions with members of the jury who stated that they found the secondary transfer theory to be implausible. Mem. in Support of Habeas Corpus, Ex. T. That jurors were unconvinced by the defense theory does not mean that counsel was deficient in pursuing that theory. Garcia has failed to show that his counsel was deficient for pursuing that theory at a time when it was not yet known how the jury would react to it.

Garcia argues, based on Goldstein's affidavit, *id.* Ex. R, that Benjamin overlooked an error in the DNA analysis. However, that Garcia has found one person to state that Benjamin made a mistake does not prove that Benjamin actually did make a mistake. Several witnesses testified that they agreed with the methodology and results of the DNA analysis. Reporter's Record, Vol. 10 at 47–48, 104–05, 137–38. Had Goldstein testified and been subject to cross-examination, the conclusions he sets forth in his affidavit may have been undermined. The jury may have discredited his testimony or found unconvincing his theory that the DNA analysis was faulty. In sum, it can neither be said that Garcia's counsel was deficient nor that calling Goldstein instead of Benjamin would have had a reasonable probability of changing the outcome of the trial.[2]

Finally, Garcia argues that his counsel was defective for opening the door to evidence that Garcia is an atheist. Pet'r's Objections 35. As the Magistrate Judge noted, Garcia's counsel was unaware that Garcia had told Dr. Theis that he did not believe in God. M&R 56; Habeas Record, Vol. 1 at 167. Garcia has not shown that his counsel was defective for asking about Garcia's faith when he was unaware that Garcia had said anything questioning it. In addition, Garcia cannot show that there is a reasonable probability that the outcome of the trial would have been different without

---

[2] Garcia also argues that his counsel was deficient for failing to interview the State's DNA expert prior to the trial, but he fails to show how conducting such an interview would have changed the outcome of the trial.

this evidence. Garcia was able to take the stand and attest to his belief in God. Garcia has offered no more than implausible assertions that this minor detail would have changed the outcome of the trial. Thus, he has not shown that his counsel was ineffective.

**5. Due Process/Sufficiency of Evidence**

Finally, Garcia argues that his claim of insufficiency of evidence was not reviewed by the Fourth Court of Appeals of Texas on direct review of his conviction. Mem. in Support of Habeas Corpus at 157. Garcia is incorrect. As the Magistrate Judge noted, M&R 58, the Court of Appeals did review the sufficiency of the evidence and held that the evidence was sufficient. *Garcia v. Texas*, 150 S.W.3d 598, 606 (Tex. App.—San Antonio 2004). The court asked whether, looking at the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt,[3] *id.* at 605, and it concluded that that standard had been met, *id.* at 606.

Garcia argues that where the evidence viewed in the light most favorable to the prosecution provides nearly equal circumstantial support to a theory of guilt as it does to a theory of innocence that the conviction must be reversed. Pet'r's Objections 40. However, as the Magistrate Judge determined, the Fourth Court of Appeals did not err in declining to apply this standard because the evidence does not equally support guilt and innocence. As the Magistrate Judge stated:

> Garcia's statements in counseling, prior to the divorce proceedings, indicated his propensity for anger and his willingness to cause Lesa harm. The "car dumping" incident in May 1998 was proof that he was willing to convert his anger into action. The apparently amicable divorce between petitioner and Lesa turned sour when, the

---

[3] Garcia's argues that the Court of Appeals did not apply the standard of review from *Geesa v. Texas*, 820 S.W.2d 154, 156–57 (Tex. Crim. App. 1991), and *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), because it expressly relied on *Burden v. Texas*, 55 S.W.3d 608, 612–13 (Tex. Crim. App. 2001). This argument is meritless. The standard is the same in all three cases.

> Thursday before Lesa was killed, her attorney demanded $7,500 out of Garcia's brokerage account, which allegedly infuriated Garcia.
> Testimony placed Garcia returning to his trailer in the family compound at 3:00 a.m. on the night of the murder. Garcia had scratches on his chest. DNA found underneath Lesa's fingernails was consistent with a mixture of Lesa's and petitioner's DNA. Testimony was presented that the bruising on Lesa's fingers was consistent with her fighting her attacker. Lesa's body was beaten and bruised. Garcia's right hand was also bruised. According to the State's experts, the injury to Garcia's hand was consistent with him striking an object or a person, and was not consistent with falling down. The determination by the state courts that the evidence was legally sufficient to sustain Garcia's conviction for murder, is not contrary to and did not involve an unreasonable application of clearly established federal law.

M&R 61. As the Magistrate Judge concluded, the Fourth Court of Appeals did not act contrary to clearly established federal law in determining that the evidence supported guilt more strongly than innocence and in applying the *Jackson* standard for sufficiency of evidence. Garcia was not denied due process.

## Conclusion

For the foregoing reasons, the recommendation of the Magistrate Judge is ACCEPTED. Petitioner Daniel Garcia's Petition for Writ of Habeas Corpus is DENIED.

It is so ORDERED.

SIGNED this 29th day of March, 2012.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE